COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| CITATION 2002 INVESTMENT LLC, and ENDEAVOR ENERGY RESOURCES, L.P., | § § | No. 08-21-00029-CV |
| Appellants, | § | Appeal from the |
| v. | § | 112th Judicial District Court |
| OCCIDENTAL PERMIAN, LTD., OCCIDENTAL PETROLEUM CORPORATION, OXY USA INC., OXY USA WTP LP, and RODEO MIDLAND BASIN, LLC, | § § § | of Reagan County, Texas (TC# CV02236 & CV02237) |
| Appellees. | § | |

## O P I N I O N

This permissive appeal involves a dispute over ownership of certain oil-and-gas interests in Reagan County, Texas. Appellants Citation 2002 Investment LLC (Citation), and Endeavor Energy Resources, L.P. (Endeavor), appeal a partial summary judgment in favor of Appellees, Occidental Permian, Ltd., Occidental Petroleum Corporation, Oxy USA Inc., Oxy USA WTP LP (collectively referred to as the Oxy Parties) and Rodeo Midland Basin, LLC (Rodeo). Specifically, Appellants appeal the trial court's declaration that a 1987 assignment from Shell Western E&P, Inc. (Shell Western) to Citation 1987 Investment Limited Partnership—Citation's predecessor-in-interest—only included interests in certain oil-and-gas leases down to specific

depths. For brevity, we refer to the 1987 assignment as the "Shell-Citation Assignment." We reverse the trial court's partial summary judgment and vacate its declaration regarding the disputed interests, determining instead that Shell Western E&P conveyed all its interest in the properties at issue without depth limitation of any kind; and we remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

The facts of the case are undisputed; only the interpretation of the Shell-Citation Assignment is at issue in this appeal. To start, we provide a bit of background about the parties and other information relevant to the underlying litigation. Necessarily, this factual background includes information about two chains of conveyances involving the parties and properties at issue.

*The Shell Western to Citation Chain of Conveyances*

In 1987, Shell Western E&P, Inc. sold a large acreage position of oil and gas properties to Citation 1987 Investment Limited Partnership, a predecessor-in-interest of Citation, in exchange for just over $75 million. This transaction included properties in West Texas and New Mexico. To effectuate this transaction, the parties executed a document titled "Shell Western/Citation (N.M./TX.) Purchase and Sale or Exchange Agreement" (PSA). Subject to the terms of the PSA, the conveyance of properties occurred according to the terms of a separate document, the Shell-Citation Assignment. The Shell-Citation Assignment incorporated and attached an Exhibit A purportedly describing the "oil and gas fee, mineral and leasehold estates" included in the subject conveyance. Exhibit A consists of over 50 pages of spreadsheet entries describing properties to be conveyed. Some of Exhibit A's descriptions include references to property depth; for example, some entries describe a tract of land "down to 8,393 feet."

*The Shell Western to Altura Chain of Conveyances*

Ten years later, in 1997, Shell Western purported to transfer by assignment certain oil-and-gas interests to Altura Energy, Ltd. (Altura) (the Shell-Altura Assignment). Some of the interests assigned purportedly involved the properties previously conveyed to Citation, but for deeper interests than those referenced in Exhibit A of the Shell-Citation Assignment. For ease of discussion, we refer to these rights as "deep rights," although no such designation was used in the assignments themselves. In 2000, Altura changed its name to Occidental Permian, Ltd. (Occidental Permian).

*Subsequent Conveyances by Citation and Occidental Permian*

In 2006, Citation assigned to Endeavor some of the interests it had obtained under the Shell-Citation Assignment. In 2019, Occidental Permian, assigned some of the interests from the Shell-Altura Assignment to Rodeo. The deep rights purportedly conveyed in the Shell-Altura Assignment are the subject of this dispute. The Oxy Parties contend—and the trial court agreed—that certain interests conveyed in the Shell-Citation assignment were depth limited, and as a result, Shell remained free to assign its deep rights to Altura. In opposition, Citation and Endeavor argue the Shell-Citation Assignment was not depth limited regarding any of the leases, and that, between them, they own all rights to the leases and other interests described in Exhibit A.

**B. Procedural background**

In April of 2019, Occidental Permian sued Endeavor for trespass to try title and other claims, asserting superior title to the deep rights in certain disputed properties (the Endeavor Suit). The Endeavor Suit was docketed by the 112th Judicial District Court under case number CV02236. Days after the Endeavor Suit was filed, Citation sued Occidental Permian and two of its affiliates for trespass to try title and other claims, regarding a different set of disputed properties (the Citation Suit). The Citation Suit was filed in the same district court and docketed under case number

CV02237. Soon, Endeavor counterclaimed for trespass to try title against Occidental Permian in the Endeavor Suit, and the Oxy Parties intervened in the Citation Suit. In total, eight properties were in dispute in the Endeavor Suit and twenty-two properties were in dispute in the Citation Suit. The trial court then granted an agreed motion to consolidate the two cases, ruling that the "issues and claims asserted by the Parties [] relating to the construction or interpretation of the [Shell Western-Citation Assignment] will be tried together[.]"

Following the consolidation, the parties filed a Rule 11 agreement, agreeing that the Shell-Citation Assignment is unambiguous and further agreeing "to a phased-in approach to the litigation by first seeking a ruling from the Court on cross motions for partial summary judgment regarding the interpretation of the [Shell-Citation Assignment] as a matter of law." Pursuant to that agreement, the parties filed cross-motions for partial summary judgment on the issue of whether the Shell-Citation Assignment was a depth-limited grant. After briefing and a hearing, the trial court ultimately granted the Oxy Parties' motion and denied Citation and Endeavor's motions. The trial court held that the Shell-Citation Assignment "is a limited grant that conveyed certain shallow rights to Citation" and "did not convey Shell's deep rights to Citation."

The trial court then granted Citation and Endeavor's unopposed motion to appeal the interlocutory summary judgment order. *See* TEX. R. CIV. P. 168; TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d). In granting permission for appeal of this issue, the trial court identified the following controlling question of law:

Is the Shell-Citation Assignment[:]

(1)   a depth-limited grant that conveyed only certain shallow rights to Citation and did not convey deep rights to Citation (as Oxy contends)?

or

(2)   an unlimited grant that conveyed to Citation all right, title and interest owned by [Shell Western] in the oil and gas fee, mineral, and leasehold estates, and contracts or instruments affecting such property, described anywhere in

4

Exhibit A to the Assignment, including all of [Shell Western's] right, title and interest above and below certain footage depths or geological formations recited in any portion of Exhibit A to the Assignment (as Citation and Endeavor contend)?

This Court subsequently granted the parties the right to pursue this permissive appeal. TEX. R. APP. P. 28.3.

## II.     ISSUE PRESENTED

The parties agree that the controlling question of law identified in the trial court's grant of permission to appeal is the sole issue presented. Accordingly, this opinion addresses whether the Shell-Citation Assignment was depth-limited regarding numerous properties, or whether it was an unlimited grant of Shell Western's interest in those properties.

## III.     DISCUSSION

### A.  Standard of review

We review a trial court's decision granting summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). This standard also applies to cases interpreting unambiguous contracts. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999). In order to prevail on a traditional motion for summary judgment, the movant must show there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). If the movant satisfies this burden, the burden shifts to the nonmovant to provide evidence that raises a genuine issue of material fact, thus avoiding summary judgment. *See Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). When cross-motions for summary judgment are filed, a court of appeals considers each motion and renders the judgment the trial court should have reached. *Coastal Liquids Transp., LP v. Harris Cnty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001).

## B. Applicable law

On cross motions, we are asked to construe the 1997 Shell-Citation Assignment to determine whether some of the interests conveyed were depth limited. To do so, we must determine and enforce the parties' intent as it is expressed within the four corners of their agreement. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020) (citing *Perryman v. Spartan Texas Six Capital Partners, Ltd.*, 546 S.W.3d 110, 117–18 (Tex. 2018)). Although neither party here contends that the Shell-Citation Assignment is ambiguous, we are required to independently make that determination at the outset of this appeal. *See Piranha Partners*, 596 S.W.3d at 743; *URI v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). To do so, we consider the contract's "language as a whole in light of well-settled construction principles and the relevant surrounding circumstances." *Piranha Partners*, 596 S.W.3d at 743 (*citing URI*, 543 S.W.3d at 763). Whether a contract is ambiguous is also a question of law that we review de novo. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018).

Ambiguity does not arise merely because parties assert differing interpretations. *See Piranha Partners*, 596 S.W.3d at 743; *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016). If the language of a contract can be given a certain or definite meaning, then the contract is not ambiguous. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 601 (Tex. 2018). Ambiguity only arises when a contract is susceptible to two or more reasonable interpretations. *ConocoPhillips*, 547 S.W.3d at 874; *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

If we determine the contract is unambiguous, our primary duty is to ascertain the intent of the parties from all the language found in the four corners of the document itself. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). We examine the entire instrument, seeking to harmonize and

give effect to each provision so that none are rendered meaningless. *Id.* at 462. To discern intent, we construe words and phrases together and in context, not in isolation. *Hysaw v. Dawkins*, 483 S.W.3d 1, 13 (Tex. 2016). In determining the parties' intent, we do not consider what "the parties meant but failed to express but, rather, the intent that is expressed." *Johnson v. Conner*, 260 S.W.3d 575, 579 (Tex. App.—Tyler 2008, no pet.). This expressed intent is determined by the plain language used in the contract. *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). Finally, we consider the entire contract and resolve any conflicts by harmonizing the provisions, where possible, "rather than by applying arbitrary or mechanical default rules." *Piranha Partners*, 596 S.W.3d at 744 (citing *Wenske v. Ealy*, 521 S.W.3d 791, 792, 796 (Tex. 2017)).

## C. Analysis

### 1. The assignment

The Shell-Citation Assignment itself is relatively short, consisting of a page and a half of text. The first paragraph contains information about the parties to the agreement. The second paragraph contains the granting clause, where Shell Western "grants, sells, assigns, transfers and conveys" to Citation, "subject to the terms and conditions contained herein" and then describes the property at issue in three numbered subparagraphs, reproduced below:

1. All of SHELL WESTERN's right, title and interest in and to the oil and gas fee, mineral and leasehold estates described in EXHIBIT A, attached hereto and made a part of this ASSIGNMENT by incorporation and reference, the same as if fully set out herein;

2. All of SHELL WESTERN's right, title and interest in and to all permits, franchises, licenses, servitudes, easements, surface leases and rights-of-way, of every character, relating to the property described in EXHIBIT A; and

3. All of SHELL WESTERN's right, title and interest in and to any contracts or agreements, including, but not limited to, rights and interests in or derived from unit agreements establishing units, gas processing agreements, joint operating agreements, enhanced recovery and injection agreements, boundary or line well agreements, assignments of operating rights, working

interests, subleases and rights above or below certain footage depths or geological formations, affecting the property described in EXHIBIT A.

The remainder of the instrument provides other "subject-to clauses," including terms, conditions, reservations, and exceptions, which are made a part of the agreement. Relevant to this case, the third such clause states as follows:

3.    It is the intent of this ASSIGNMENT to transfer and convey to CITATION and SHELL WESTERN does hereby convey and transfer to CITATION all rights and interests now owned by SHELL WESTERN, its successors and assigns, in the leases and other rights described herein, regardless of whether the same may be incorrectly described or omitted from Exhibit A, and regardless of whether SHELL WESTERN may have record title to the interests owned by it on the date hereof. This paragraph shall not apply to any purchases or acquisitions by SHELL WESTERN hereafter when SHELL WESTERN acquires an interest in the properties described herein by giving new consideration therefor.

The attached Exhibit A, which is incorporated by reference, consists of a 51-page spreadsheet. The first nine pages appear to describe interests in individual wells, while the other 42 pages appear to describe leases and other oil-and-gas-related interests. Regarding the nine pages devoted to individual wells, the spreadsheet has six columns, labeled as follows:

| KEY CODE | WELL NAME | DESCRIPTION | GROSS WORKING INTEREST | NET WORKING INTEREST | REMARKS |
|---|---|---|---|---|---|

Under the "DESCRIPTION" column, some of the interests make references to depths. Where an interest contains a reference to depth in the description column, in each instance, the "REMARKS" column makes references to one or more other interests or agreements to which the well is subjected, such as an overriding royalty interest or a farmout agreement.

Similarly, the 42 pages of Exhibit A that describe other oil-and-gas-related interests include spreadsheets with six columns, although they are labeled slightly differently:

| I. | II. | III. | IV. | V. | VI. |
|---|---|---|---|---|---|
| SHELL LEASE NUMBER | INSTRUMENT DATE AND RECORD | LESSOR-LESSEE OR GRANTOR-GRANTEE | TRACT DESCRIPTION | INTEREST ASSIGNED IN DESCRIBED TRACT | BEING SUBJECT TO THE FOLLOWING AGREEMENTS |

Columns I, II, and III, as their labels suggest, include general information to identify the lease at issue. Like the description column in the first nine pages, the "TRACT DESCRIPTION" column on these spreadsheets occasionally mentions certain depths, for example:

| IV.<br><br>TRACT DESCRIPTION | V.<br><br>INTEREST ASSIGNED IN DESCRIBED TRACT | VI.<br><br>BEING SUBJECT TO THE FOLLOWING AGREEMENTS |
|---|---|---|
| Block A, A-271, L&SV Ry. Co. Survey Sec 23: SE¼ and NW¼ down to 8,393 feet | 1.0000000 WI. .8750000 NRI. | Gas Purchase Contract dated 12-14-79 with El Paso Natural Gas effective 02-25-80. |
| Block A, A-955, L&SV Ry. Co. Survey Sec 28: E½SE¼, down to 8,393 feet | .5000000 WI. .4375000 NRI. | Operating Agreement dated 03-01-66 with Shell Oil Company, Operator, and Southland Royalty et al, Non-Operators.<br><br>Gas Purchase Contract with El Paso Natural Gas effective 02-25-80, dated 12-14-79. |

Like in the first nine pages, all references to depth in the "TRACT DESCRIPTION" column are accompanied by some explanation of a contract or agreement to which the interest is subjected to in the last column.

*2. Interpreting the assignment*

Appellees' general position on the interpretation of the Shell-Citation Assignment and its Exhibit A—with which the trial court agreed—is that by referencing Exhibit A to describe the interests being conveyed, the Shell-Citation Assignment could only convey interests to the extent they were described in Exhibit A. And Exhibit A's references to certain interests down to a certain number of feet evidences an intent to convey that interest only down to that depth. Appellees argue that no other meaning could be given to the depth references and, as a result, anything Shell Western owned below those depths before the execution of the Shell-Citation Assignment, it continued to own after. If Appellees correctly interpret the instrument, then Shell Western's later

9

conveyance of the so-called deep rights to Altura remains valid and of full legal effect. To that end, title to the disputed interests are now vested in either the Oxy Parties or Rodeo, respectively.

Appellants argue that Shell Western's intent was to convey all of its interest in the wells described in the first two columns of the nine pages of spreadsheets describing individual wells and all of its interest in the leases and properties described in the first three columns of the remaining 42 pages of spreadsheets. They argue that the depth references found in the "DESCRIPTION" or "TRACT DESCRIPTION" columns were merely descriptions of the portions of those well- or lease-interests that were subject to other contracts or agreements with third parties. If they are correct, Shell Western conveyed to Citation *all* its interests in the named wells, leases, and properties, and thus, it could not have later conveyed to Altura any interests in those properties, unless it had later acquired the interests by way of new consideration after the execution of the Shell-Citation Assignment. And if such was the case, then title to the disputed properties is now vested in Citation and Endeavor, respectively.

As a preliminary matter, we agree with the parties that the Shell-Citation Assignment, and Exhibit A, are unambiguous. As a result, our primary duty is to ascertain the intent of the parties from all the language found in the four corners of the document itself. *Luckel*, 819 S.W.2d at 461. We have previously said that "where an exhibit is referenced to describe the property being conveyed, it is the description of the interest in the *exhibit* which controls the scope of the grant, regardless of the breadth of the granting language." *Posse Energy, Ltd. v. Parsley Energy, LP*, 632 S.W.3d 677, 693 (Tex. App.—El Paso 2021, pet. denied). But such an exhibit is only relevant because of—and to the extent of—the relevant granting language. *See Piranha Partners*, 596 S.W.3d at 752–55. In *Posse Energy*, broad granting language in the assignment itself was overridden by limiting language within the exhibit. *Posse Energy*, 632 S.W.3d at 693. Specifically, the granting language in that case stated that the grantor conveyed "[t]he oil and gas leases . . . and

10

other estates and properties which are specifically described in Exhibit A attached hereto and made a part hereof for all purposes[.]" *Id.* at 688. The granting language also expressed an intent to convey all other rights, titles, and interests in "estates or property interests specifically described or referred to in Exhibit A" and "all rights, options, titles and interests of [the grantor] related to the Subject Properties[.]" *Id.* at 688–89. Finally, the granting language stated that the assignment conveyed "[a]ll rights, titles and interests of [the grantor] in, to and under . . . all other contracts, warranties, agreements, documents, instruments and rights which are appurtenant to any of the interests specifically described in the above subsections . . . ." *Id.* at 689.

In short, the granting language at issue in *Posse Energy* was extremely broad, and included all interests related to anything specifically described in the attached exhibit. *Id.* However, the attached exhibit itself included critical, limiting language; the exhibit described the grantor's interest in a specific lease, but "INSOFAR AND ONLY INSOFAR" as that lease covered certain proration units specifically identified. *Id.* at 694. There, we determined that the phrase "insofar and only insofar as," served as a limitation on the conveyance. *Id.*

This case is factually distinguishable from *Posse Energy*. First, Exhibit A contains no such limiting language, but instead, merely contains depth references among other information provided by the tract description column of data. And second, although the granting clause of the Shell-Citation Assignment directs our attention to Exhibit A for a description of the interests being conveyed by the agreement, it also makes the grant "subject to the terms and conditions contained herein[.]" Most relevant, an express term and condition of the assignment states as follows:

> It is the intent of this ASSIGNMENT to transfer and convey to CITATION . . . *all rights and interests now owned by SHELL WESTERN* . . . in the leases and other rights described herein, *regardless of whether same may be incorrectly described or omitted from Exhibit A*, and regardless of whether SHELL WESTERN may have record title to the interests owned by it on the date hereof. (Emphasis added.)

The plain language of this provision demonstrates an intent to convey "all rights and interest now

owned by SHELL WESTERN . . . in the leases and other rights described," and such conveyance is made of all interests regardless of whether any properties are incorrectly described or omitted from Exhibit A. In other words, Exhibit A provides information relevant to the agreement, but it was not intended to preclude a transfer of *all* of Shell Western's interest in the leases and other rights described therein.

The Supreme Court of Texas has made clear in *Piranha Partners*—a case this Court cited to extensively in *Posse Energy*—that where an instrument of conveyance refers to an exhibit for a property description, courts must harmonize the language of both the instrument and the exhibit to determine the parties' intent. *Piranha Partners*, 596 S.W.3d at 752–55. In *Posse Energy*, the limiting language in the exhibit, as harmonized with the agreement, required an interpretation of limitation of the conveyance. *Posse Energy*, 632 S.W.3d at 694. However, in this case, when we harmonize the language in the Shell-Citation Assignment with the attached exhibit, we see no such limiting language, even when considering references to depth.

Here, the subparagraphs under the granting clause of the Shell-Citation Assignment convey as follows: (1) "[a]ll of SHELL WESTERN's right, title and interest in and to the oil and gas fee, mineral and leasehold estates described in EXHIBIT A," (2) "[a]ll of SHELL WESTERN's right, title and interest in and to all permits, franchises, licenses, servitudes, easements, surface leases and rights-of-way, of every character, relating to the property described in EXHIBIT A[,]" and (3) "[a]ll of SHELL WESTERN's right, title and interest in and to any contracts or agreements, including, but not limited to . . . rights above or below certain footage depths or geological formations, affecting the property described in EXHIBIT A." And second, Exhibit A provides description of interests in individual wells and other oil-and-gas-related interests. Although the descriptions given for some of each contain references to depth, those descriptions are not themselves controlling as the parties expressly stated by the "subject-to" clause. Instead, these

references were made to third parties' interests in other agreements regarding the respective properties. This is evidenced by the references to such third-party agreements in the final column of the spreadsheet entries that contained such references to depth.

Appellees argue that if we do not interpret the depth references in Exhibit A as limitations on the conveyance, then we essentially render the words meaningless, in violation of one of our rules of construction. *See Luckel*, 819 S.W.2d at 462. We disagree. In *Piranha Partners*, the exhibit at issue in that case referred to (1) a specific well, (2) the land on which the well sat, and (3) the lease covering said land, which covered an even greater area of land. *Piranha Partners*, 596 S.W.3d at 745. The issue there—like here—was whether the more specific references in the exhibit, namely the well and the land on which the well sat, limited the conveyance to only those interests, as opposed to the grantor's interest in the entire lease. *Id.* There, in the absence of any specific limiting language, the Supreme Court of Texas held that the reference to a specific well in the exhibit served to "more clearly identif[y] the Puryear Lease under which the overriding royalty existed." *Id.* at 754–55. Similarly, we hold that the references to depth in Exhibit A are not rendered meaningless by our interpretation; they serve to provide more information about third-party interests to which the interests being conveyed were subject to.

Finally, Appellees argue that the subject-to clause in the third numbered paragraph under the terms and conditions portion of the Shell-Citation Assignment is merely a Mother Hubbard clause meant to clean up small errors. We disagree. In the oil-and-gas context, a Mother Hubbard clause is a "provision in an oil-and-gas lease protecting the lessee against errors in the description of the property by providing that the lease covers all the land owned by the lessor in the area." *Mother Hubbard clause*, BLACK'S LAW DICTIONARY (10th ed. 2014). But nothing in the paragraph at issue discusses strips of land or limits the paragraph's application to small errors. In *Davis v. Mueller*, a case all parties cite in their briefs for various propositions, the Court dealt with the

13

characterization of general grants and Mother Hubbard clauses. 528 S.W.3d 97, 99 (Tex. 2017). The language at issue in that case read as follows:

> The "Lands" subject to this deed also include all strips, gores, roadways, water bottoms and other lands adjacent to or contiguous with the lands specifically described above and owned or claimed by Grantors. If the description above proves incorrect in any respect or does not include these adjacent or contiguous lands, Grantor shall, without additional consideration, execute, acknowledge, and deliver to Grant[ee], its successors or assigns, such instruments as are useful or necessary to correct the description and evidence such correction in the appropriate public records. Grantor hereby conveys to Grantee all of the mineral, royalty, and overriding royalty interest owned by Grantor in Harrison County, whether or not same is herein above correctly described.

*Id.* In *Davis*, the Supreme Court of Texas characterized the first two sentences of the above-quoted paragraph as the document's Mother Hubbard clause. *Id.* Notably, however, it characterized the final sentence—which is very similar to the language in the third numbered paragraph under the terms and conditions section of the Shell-Citation Assignment—as a general granting clause. *Id.*

To be clear, we do not mean to imply that a Mother Hubbard clause must have specific or standard language. However, Appellees have provided no examples of a Mother Hubbard clause absent of references to strips, gores, or other small pieces of land adjacent and contiguous to the land described in a conveyance. We agree with Appellants that this intention paragraph serves as a general granting clause, much like the one so labeled in *Davis*. In *Davis*, the Supreme Court of Texas refused to consider the third sentence as being part of the Mother Hubbard clause; rather, interpreting the plain language, *Davis* held: "All means all." *Id.* at 102.

In sum, we hold that the Shell-Citation Assignment, including Exhibit A, is unambiguous; that, when harmonized, the express language of both demonstrate an intent to convey *all* of Shell Western's interest then owned in the leases and other rights described therein, regardless of whether such were correctly described in Exhibit A; and the references to depth in Exhibit A do not limit Shell Western's conveyance to Citation, they simply describe portions of the respective

14

interests that were subject to some type of third-party contract or agreement. In answering the trial court's controlling question of law, we determine that the Shell-Citation Assignment was not depth-limited, but instead, it conveyed to Citation all right, title, and interest owned by Shell Western in the oil-and-gas fee, mineral, and leasehold estates, as well as any contracts or instruments affecting the same, that were described in Exhibit A, whether correctly described or omitted. Accordingly, the trial court erred, and Appellants' sole issue is sustained.

## IV.    CONCLUSION

We reverse the trial court's summary judgment ruling and vacate its declaration that the 1987 assignment conveyed only certain shallow rights to Citation, not deep rights; and we remand this case for further proceedings consistent with this opinion.


GINA M. PALAFOX, Justice

December 22, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.